UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CONTINENTAL CASUALTY COMPANY, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 1:17-cv-1523<br>) |
| CANTOR COLBURN, LLP; PETER R. HAGERTY; CHARLES F. O'BRIEN; MICHAEL RYE | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Continental Casualty Company ("Continental"), for its Complaint for Declaratory Judgment, alleges on knowledge, information, and belief as follows:

**NATURE OF THE ACTION**

1. Continental files this action to obtain a judicial determination and declaration of the parties' respective rights and obligations under Lawyers Professional Liability Policy No. 198279108, which Continental issued to Cantor Colburn, LLP (the "Firm") for the **policy period**[1] of October 30, 2015 to October 30, 2016 (the "Policy"). A true and correct copy of the Policy (except for the application) is attached hereto as Exhibit A.

2. An actual and justiciable controversy has arisen and now exists relating to the parties' respective rights, duties, and obligations under the Policy.

3. In particular, Continental seeks a judicial declaration that the Policy does not provide coverage for motions for sanctions and attorneys' fees filed against the Firm and certain

---

[1] Terms in bold are defined in the Policy and carry the same meaning here.

Firm attorneys in the underlying proceedings (the "Sanctions Motions"), because the Sanctions Motions all arise from intentional wrongdoing by the Firm and its client, as determined by the findings of this Court, and only seek amounts that do not constitute covered "damages" as clearly and unambiguously defined by the Policy.  In addition, neither the Firm nor the individual insureds who represented the client in the underlying proceedings are entitled to coverage under the Policy because of material misrepresentations in the Firm's application for the Policy.

4. The Firm tendered the Sanctions Motions to Continental for coverage under the Policy.  To protect the interests of the insurers while the coverage issues remained undecided, Continental consented to the appointment of independent counsel to represent the Insureds' interests and is providing the Firm a defense subject to a full and complete reservation of rights, including but not limited to the right to withdraw from that defense and to seek reimbursement of all amounts paid by Continental.

## PARTIES

5. Plaintiff Continental is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business located in Chicago, Illinois.  Continental legally transacts insurance business in Indiana and within the geographical jurisdiction of this Court.

6. Defendant Cantor Colburn, LLP is a limited liability partnership with its principal place of business at 20 Church Street, Hartford, Connecticut.  Upon information and belief, the Firm is a citizen of Connecticut, Georgia, Michigan, and Virginia because its partners are citizens of those states.  The Firm is the **Named Insured** under the Policy.

7. Peter R. Hagerty ("Hagerty") is a partner of the Firm, is a citizen of the state of Georgia, and qualifies as an **Insured** under the Policy.

8. Charles F. O'Brien ("O'Brien") is a partner of the Firm, is a citizen of the state of Connecticut, and qualifies as an **Insured** under the Policy.

9. Michael Rye ("Rye") is a partner of the Firm, is a citizen of the state of Connecticut, and qualifies as an **Insured** under the Policy.

## JURISDICTION AND VENUE

10. This is an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure, for the purposes of determining a question of actual controversy between the parties as described more fully below.

11. This action currently is ripe for adjudication.

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. A substantial part of the events giving rise to the claims at issue occurred in this District.

## FACTUAL ALLEGATIONS

**The Applications and the Policy**

14. On October 13, 2015, Philmore H. Colburn ("Colburn"), on behalf of the Firm and its partners and employees, executed a Short Form Renewal Application for Lawyers Professional Liability Insurance (the "2015 Application"). A redacted copy of the 2015 Application is attached as Exhibit B. Continental has redacted Exhibit B so as not to make public information that the Firm may consider confidential, but Continental has no objection to the Firm making the entire 2015 Application or other parts of the 2015 Application part of the record in this case.

15. The <u>2015</u> Application states:

   Applicant's authorized representative hereby represents that after reasonable inquiry, the information contained herein and in any supplemental applications or forms required hereby, is true, accurate and complete and that no material facts as relates [to] the questions contained in this application, and any supplemental applications, and any other statements furnished to the Company in conjunction with this application have been suppressed or misstated. Applicant acknowledges a continuing obligation to report to the Company as soon as practicable any material changes in all such information, after signing the application and prior to inception of the policy, and acknowledges that the Company shall have the right to withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance based upon such changes.

   Further, Applicant understands and acknowledges that:

   (1) if a policy is issued, the Company will have relied upon, as representations: this application, and any supplemental applications, and any other statements furnished to the Company in conjunction with this application, all of which are hereby incorporated by reference into this application and made a part hereof;

   (2) this application will be the basis of the contract and will be incorporated by reference into and made a part of such policy.

16. Question 10 of the 2015 Application asked:

   After inquiry, is any attorney of the firm aware of any acts, error or omissions in the performance of professional services that may reasonably be the basis of a professional liability claim against the firm or any member of the firm since the date of the firm's last application to the Company and that has <u>not</u> been reported to the Company?

17. The Firm answered "no" to Question 10.

18. The Firm also answered "no" to the same question in the August 25, 2014 application for the preceding policy, which was effective October 30, 2014 to October 30, 2015 and was also issued by Continental to the Firm ("the 2014 Application").

19.     The Firm was required to update the 2015 Application if there were material changes in the information provided between the date the 2015 Application was signed (October 13, 2015) and the inception date of the Policy (October 30, 2015).

20.     The Policy expressly states:

>   By acceptance of this Policy the **Insured** agrees that:
>
>   1.  all of the information and statements provided to the **Company** by the **Insured** are true, accurate and complete and shall be deemed to constitute material representations made by all of the **Insureds**;
>
>   2.  this Policy is issued in reliance upon the **Insured's** representations;
>
>   3.  this Policy, endorsements thereto, together with the completed and signed application and any and all supplementary information and statements provided by the **Insured** to the **Company** (all of which are deemed to be incorporated herein) embody all of the agreements existing between the **Insured** and the **Company** and shall constitute the entire contract between the **Insured** and the **Company**; and
>
>   4.  the misrepresentation of any material matter by the **Insured** or the **Insured's** agent will render this Policy null and void and relieve the **Company** from all liability herein.

*See* Exhibit A, Section V.L.

21.     In reliance on the information provided in the 2015 Application, and pursuant to Section V.L., Continental issued the Policy to the Firm.

22.     The Policy includes a Quota Share Endorsement and is underwritten by Continental and Axis Insurance ("Axis"). It includes a $15 million each **claim** limit of liability and a $30 million aggregate limit of liability, inclusive of **claim expenses**. *See* Exhibit A, Policy, Endorsement No. 9.

23. Per the Quota Share, Continental's and Axis's liability under the Policy is several, not joint, and Continental and Axis are responsible for $10 million and $5 million, respectively, of the each **claim** Policy limit. *See id.*

24. The Policy also includes an each **claim** deductible of $75,000 and an aggregate deductible of $200,000. *See id.*

25. The Policy's Insuring Agreement states:

> The **Company** agrees to pay on behalf of the **Insured** all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the **Insured** and reported in writing to the **Company** during the **policy period** by reason of an act or omission in the performance of **legal services** by the **Insured** or by any person for whom the **Insured** is legally liable

*See* Exhibit A, Section I.A.

26. The **Company** means Continental. *See* Exhibit A, Section III.

27. The Policy defines **Insured** as the **Named Insured** and "any lawyer (including a government affairs advisor or lobbyist), partnership, professional corporation, professional association, limited liability company or limited liability partnership who is or becomes a partner, officer, director, stockholder-employee, associate, manager, member or **employee** of the **Named Insured** during the **policy period** shown in the Declarations." *See id.*

28. A **claim** is defined as "a demand, including the service of suit or the institution of any alternative dispute resolution proceeding, received by the **Insured** for money or services arising out of an act or omission, including **personal injury**, in the rendering of or failure to render **legal services**." *See id.*

29. **Legal services** mean "those services, including eleemosynary (pro bono) services, performed by an **Insured** for others as a lawyer, arbitrator, mediator, title agent or other neutral

fact finder or as a notary public. Any title agency or company, on whose behalf the **Insured** acts as title agent or designated issuing attorney, is not an **Insured** under this Policy." *See id.*

30. The Policy defines **claim expenses** as "fees charged by attorneys designated by the **Company** or by the **Insured** with the **Company's** written consent" and "all other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **claim** if incurred by the **Company**, or by the **Insured** with the written consent of the **Company**." *See id.*

31. **Damages** are defined as

> judgments, awards and settlements (including pre-judgment interest), provided any settlements are negotiated with the assistance and approval of the **Company**. Notwithstanding anything to the contrary contained herein, **Damages** also include those amounts the court is permitted to impose on a debt collector as set forth in 15 U.S.C. §1692k(a).
>
> **Damages** do not include:
>
> . . .
>
> B.    civil or criminal fines, sanctions, penalties or forfeitures, whether pursuant to law, statute, regulation or court rule, including but not limited to awards under 18 U.S.C. §1961, *et. seq.*, Federal Rules of Civil Procedure 11 or 28 U.S.C. §1927 and state statutes, regulations, rules or law so providing, and injuries that are a consequence of any of the foregoing;
>
> . . .
>
> C.    punitive or exemplary amounts.

*See id.*

32. The Policy states that Continental "shall have the right and duty to defend in the **Insured's** name and on the **Insured's** behalf, a **claim** covered by this Policy, even if any of the

7

allegations of the **claim** are groundless, false, or fraudulent." *See id.*, Section I.B., as amended by Endorsement No. 5.

    33.    The Policy provides that it does not apply

        to any **claim** based on or arising out of any dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing by an **Insured** except that:

        1.    this exclusion shall not apply to **personal injury;**

        2.    the **Company** shall provide the **Insured** with a defense of such **claim** unless or until the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive any of the **Company's** rights under this Policy. Criminal proceedings are not covered under this Policy regardless of the allegations made against any **Insured**;

        3.    this exclusion will not apply to any **Insured** who is not found to have personally committed the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing by any trial verdict, court ruling, or regulatory ruling.

*See id.*, Section IV.A (the "Intentional Acts Exclusion").

**The Firm's Representation of CleanTech**

    34.    In March, 2008, CleanTech Corporation and Greenshift Corporation (together, "CleanTech") retained Hagerty and the Firm to represent them before the United States Patent and Trademark Office ("PTO") in connection with the prosecution of several patents related to a method of separating corn oil from heated thin stillage (a byproduct of ethanol production) using a centrifuge. The Firm took over the prosecution of the patents from CleanTech's previous counsel, who submitted the first patent application to the PTO on August 17, 2004 and worked on CleanTech's behalf thereafter.

35. In September, 2009, CleanTech retained Rye, O'Brien, and the Firm also to act as litigation counsel to pursue numerous patent infringement lawsuits concerning the potential patent for the corn oil separation method.

36. On October 13, 2009, the PTO allowed a patent for the corn oil separation method and, thereafter, the Firm continued to prosecute related patents for CleanTech.

37. Beginning in February, 2010, the Firm filed over ten patent infringement lawsuits on behalf of CleanTech against various defendants. These lawsuits were consolidated into multi-district litigation in the United States District Court for the Southern District of Indiana, No. 1:10-cv-00180-LJM-DML (the "MDL Litigation"). The Firm also represented CleanTech in a separate, but related, patent infringement lawsuit filed against Adkins Energy, LLC in the United States District Court for Northern District of Illinois, captioned, *GS CleanTech Corporation v. Adkins Energy LLC*, No. 1:10-cv-4391 (N.D. Ill.) (the "Adkins Litigation").

**The Insureds' Knowledge Before October 30, 2015 of Acts that May Reasonably be the Basis of a Professional Liability Claim**

38. A central issue in the MDL Litigation is the inequitable conduct by CleanTech and the Firm because of intentionally providing misleading information to the PTO regarding an "on-sale bar." An "on-sale bar" prohibits the grant of a patent to any person for "an invention" that has been "on sale" for more than one year before making a patent application. *See* 35 U.S.C. § 102(b). Defendants in the MDL Litigation (the "MDL Defendants") contend that CleanTech's technology was ready for patenting in 2003 and that CleanTech triggered the on-sale bar by making a commercial offer of sale to Agri-Tech Energy ("Agri-Tech") more than one year before the August 17, 2004 initial patent application.

39. To prove inequitable conduct (and therefore invalidating any patents obtained based on that misconduct), the MDL Defendants were required to establish, by clear and

9

convincing evidence, that CleanTech had a specific intent to deceive the PTO. The intent to deceive "must be 'the single most reasonable inference able to be drawn from the evidence'" and the evidence "'must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.'" *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (*en banc*) (internal citations omitted) (emphasis in original).

40. The allegations contained in the Adkins Action and the MDL Litigation indicate that, before October 30, 2015, Hagerty and O'Brien made numerous statements to intentionally mislead the PTO, including submitting false declarations and statements to the PTO, to obtain patents for CleanTech. The Court further questioned the conduct of the Firm's attorneys and granted discovery in the MDL against the Firm, Hagerty, and O'Brien.

41. On April 23, 2013, the MDL Defendants issued a subpoena to O'Brien, who was second chair litigation counsel for CleanTech in the MDL Litigation, for his deposition and production of documents in connection with demonstrably false disclosures made by CleanTech, with the assistance of the Firm, to the PTO to obtain patents.

42. CleanTech moved to quash the subpoena and the MDL Defendants filed an opposition brief, stating it was necessary to obtain the information to prove their defense of inequitable conduct based on the Firm's actions before the PTO. The MDL Defendants argued that O'Brien "directly participated in the drafting of a false affidavit and helped devise a strategy that failed to provide a full and candid disclosure of the facts known to him and the inventors concerning the 2003 Agri-Energy events."

43. On July 23, 2013, the Court in the MDL Litigation allowed O'Brien's testimony and denied the motion to quash, finding the MDL Defendants "should be permitted additional discovery to pursue their theory of a deliberate plan to deceive the PTO."

44. The Court also issued a supplemental Order, allowing the MDL Defendants to discover the Firm's work product, including mental impressions, concerning various submissions to the PTO. The Court determined the MDL Defendants have shown "their inequitable conduct claim … is substantial enough to merit discovery into the attorneys' thought-processes regarding the contents and timing surrounding those disclosures and non-disclosures." Thus, the Court allowed discovery "on strategies or mental impressions tied directly to the contents of disclosures, the timing of disclosures, and a lawyer's direct participation in deciding timing of disclosures and in preparing documents (or directing the contents of documents) that were filed with the patent office."

45. The MDL Defendants also contended that the Firm attorneys' "fraud on the PTO continued" even after O'Brien's deposition, by submitting a September 2, 2014 "disclosure to the PTO that persisted in failing to tell the whole story."

46. On October 30, 2014, after O'Brien's deposition, the MDL Defendants filed a motion to compel the depositions of additional Firm attorneys. In support of the motion, Defendants stated

> that the inequitable conduct defense was about telling the PTO a materially abbreviated and misleading version of the Agri-Energy story that does not lay open the course of dealing that reveals the offer of sale. It is about selectively submitting documents that are innocuous on their face without explanation while withholding the most damaging ones. It is also about telling the PTO a false story that the feasibility testing occurred in May of 2004, thereby falsely suggesting that the inventive method was not reduced to practice prior to the offer. It is about never bringing the full and accurate story to the Examiner's attention and instead, simply burying it and only sending any information in at points in time when the Examiner is less likely to meaningfully review them. Finally, it is about a group of patent lawyers [the Firm attorneys], all of whom are members of the PTO Patent Bar, who once they had each injected themselves into the patent prosecution, all owed a continuing and non-delegable duty of candor to the PTO that was *not* honored." (emphasis added).

11

47.	Although the Court refused to allow additional Firm attorneys to be deposed, the Court allowed the MDL Defendants to re-take Hagerty's deposition stating, it "disagree[d] that CleanTech has provided the defendants with straightforward answers concerning the lawyers' decisions and strategies surrounding … disclosures to the PTO."

**The Court Finds Intentional Wrongdoing by the Firm**

48.	Following a nine-day bench trial in early October, 2015, on September 15, 2016, the Court in the MDL Litigation issued a 78-page opinion finding "inequitable conduct before the PTO" by CleanTech *and* the Firm, since they "intentionally withheld material from the PTO."  A true and correct copy of the September 15, 2016 Corrected Memorandum Opinion and Order is attached as Exhibit C.

49.	The Court determined that, in or around March 24, 2010, the Firm learned of a July 31, 2003 offer by CleanTech to sell the corn oil separation method to Agri-Energy, which was more than a year before the initial patent application was filed.  Exhibit C at 31-32.

50.	After receiving these 2003 documents in 2010, the Firm investigated CleanTech's interactions with Agri-Energy to assess the potential applicability of the on-bar sale.  Exhibit C at 33-39.

51.	In November, 2010, the Firm drafted a declaration to be submitted to the PTO by CleanTech concerning CleanTech's 2003 interactions with Agri-Energy.  This first declaration stated that the signed July 31, 2003 letter from CleanTech was <u>first delivered</u> to Agri-Tech representatives on August 18, 2003, which was one day after the on-sale bar date of August 17, 2003 ("the First Declaration").  The Firm filed the First Declaration with the PTO on November 9, 2010.  Exhibit C at 40-42.

52.     On September 21, 2011, defendants in the MDL Litigation deposed the CleanTech inventor who signed the First Declaration. Exhibit C at 43. During that deposition, the MDL Defendants confronted the inventor with an August 1, 2003 e-mail to Agri-Tech enclosing an unsigned version of the July 31, 2003 letter. The Court concluded that, based on this testimony, the August 18, 2003 statement in the First Declaration was "false." Exhibit C at 41.

53.     Hagerty, the Firm attorney responsible for the patent prosecution, testified that "it sent a chill up his spine" when he learned that the letter had been sent on August 1, 2003. Exhibit C at 43. The Court stated that the only plausible reason for Hagerty to be "concerned at all is because the story he presented to the PTO was false." Exhibit C at 44.

54.     The Court found that the Firm failed to contact the inventor for seven months after his deposition testimony and never contacted Agri-Energy from September 2011 to April 2012 to investigate the authenticity of the August 1, 2003 e-mail. Exhibit C at 44-45.

55.     The Court stated, "Most disturbing is that, during this period [September 2011 to April 2012], neither litigation counsel [at the Firm or Hagerty] did anything to alert the PTO that [First Declaration] was false . . . ." Exhibit C at 45. In addition, the Firm filed a response to an office action from the PTO and failed to include any information to correct the First Declaration. Exhibit C at 45.

56.     In July, 2012, CleanTech's inventor executed a second declaration that the Firm prepared regarding the August 1, 2013 e-mail, which was submitted to the PTO along with several redacted filings from the MDL Litigation (the "Second Declaration"). The Court held that the Second Declaration "fails to distinctly point out and/or explain the false information previously provided to the examiner in [the First Declaration]. In addition, the [Second

Declaration] creates the false impressions [the inventor] may not have sent the August 1, 2003, e-mail and that the unsigned letter has less significance than the 'signed' one he allegedly hand delivered the same month." Exhibit C at 48.

57.   Based on these findings, the Court considered "both the failure to explain the significance of the documents and the failure to provide the PTO with an un-redacted version of the filed papers or the underlying documents themselves strong evidence of an intent to deceive." Exhibit C at 50.

58.   The Court also analyzed multiple patents obtained by the Firm for CleanTech "to determine whether material documents were intentionally excluded when they should have been submitted." Exhibit C at 65.

59.   The Court made the following findings concerning the Firm's intentional deceit of the PTO:

- "The Court can only conclude that [the inventors] intentionally allowed [Hagerty] to create this false impression and that [Hagerty], knowing and relying on facts to the contrary, purposefully withheld the results in 2003 in favor of the new story" that "created a false impression that the first time information existed to confirm the method was May 2004." Exhibit C at 68.

- "In prosecution of the '516 and '517 patents, the inventors and attorneys misrepresented to the PTO that the July 31 [2003] offer letter was immaterial by filing the false [First Declaration] and by leaving un-rebutted the irrelevant 2004 feasibility testing letter." Exhibit C at 72.

- "On September 21, 2011, Defendants deposed [one of the inventors] and the August 1, 2003, email with the July 31 [2003] Proposal attachment was

disclosed. At this point, the inventors and Cantor Colburn know for certain that [the First Declaration] is false. The Court finds strong evidence of intentional deceit in the ensuing delay by Cantor Colburn in investigating the facts . . . ." Exhibit C at 74.

60. The Court held, "For those reasons, as well as the reasons outlined here, the Court concludes that the inventors and the attorneys *intentionally* withheld material information from the PTO during prosecution of the '484 patent." Exhibit C at 77 (emphasis added).

**The Sanctions Motions**

61. On March 22, 2016, Adkins Energy sought sanctions against CleanTech under 35 U.S.C. § 285 and against the Firm, including its attorneys of record, under 28 U.S.C. § 1927 for litigation misconduct (the "Adkins Motion").

62. On September 26, 2016, following the Court's Inequitable Conduct ruling, the MDL Defendants expressed their intent to seek attorneys' fees, expert fees, expenses, and costs as sanctions against CleanTech and the Firm, pursuant to F.R.C.P. 11, 35 U.S.C. § 285, and 28 U.S.C. §1927 (together, with the Adkins Motion, "the Sanctions Motions"). Because of various extensions and a stay in the MDL Litigation, the MDL Defendants have not yet filed their motions for attorneys' fees and sanctions in the MDL Litigation.

**The Firm's Tender of the Sanctions Motions**

63. On September 30, 2016, the Firm *for the first time* provided Continental via e-mail with notice of a "new potential matter," forwarding an October 23, 2014 Summary Judgment decision (almost two years later), the September 15, 2016 Inequitable Conduct ruling, and the Sanctions Motions, and seeking coverage under the Policy.

64. On December 6, 2016, Continental issued a letter to the **Insureds** setting forth its position with respect to coverage, agreeing to accept the defense of the Sanctions Motions subject to a reservation of rights and also agreeing to the **Insureds'** retention of independent counsel of its choice to represent the Firm against the Sanctions Motions.

## COUNT I

### For a Declaration that There Is No Coverage for the Sanctions Motions Based on the Intentional Acts Exclusion

65. Continental re-alleges and incorporates by reference Paragraphs 1-64 of this Complaint as if fully set forth herein.

66. The Intentional Acts exclusion provides that the Policy does not apply:

> To any **claim** based on or arising out of any dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing by an **Insured** except that:
>
> 1. this exclusion shall not apply to **personal injury;**
>
> 2. the **Company** shall provide the **Insured** with a defense of such **claim** unless or until the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive any of the **Company's** rights under this Policy. Criminal proceedings are not covered under this Policy regardless of the allegations made against any **Insured**;
>
> 3. this exclusion will not apply to any **Insured** who is not found to have personally committed the dishonest, fraudulent, criminal, malicious act or omission or intentional wrongdoing by any trial verdict, court ruling, or regulatory ruling.

*See* Exhibit A, Section IV.A.

67. The Sanctions Motions are based on or arise out of intentional wrongdoing by any **Insured**.

68. The **Insureds** intentional wrongdoing has been determined by a court ruling; the September 15, 2016 Corrected Memorandum of Opinion and Order After Bench Trial.

69. The Intentional Acts Exclusion applies both to the Firm and the individual attorneys, Hagerty, O'Brien and Rye, who represented CleanTech.

70. Therefore, Continental is entitled to a judgment declaring that the Policy provides no coverage to the **Insureds** for the Sanctions Motion and that Continental has no duty to defend or indemnify the **Insureds** with respect to the Sanctions Motion.

## COUNT II

### For a Declaration that There Is No Coverage for the Sanctions Motions Because They Do Not Seek Covered Damages

71. Continental re-alleges and incorporates by reference Paragraphs 1-64 of this Complaint as if fully set forth herein.

72. The Policy only provides coverage for amounts that constitute **Damages**. **Damages** are defined in/by the Policy as:

> judgments, awards and settlements (including pre-judgment interest), provided any settlements are negotiated with the assistance and approval of the **Company**. Notwithstanding anything to the contrary contained herein, **Damages** also include those amounts the court is permitted to impose on a debt collector as set forth in 15 U.S.C. §1692k(a).
>
> **Damages** do not include:
>
> . . .
>
> B.     civil or criminal fines, sanctions, penalties or forfeitures, whether pursuant to law, statute, regulation or court rule, including but not limited to awards under 18 U.S.C. §1961, *et. seq.*, Federal Rules of Civil Procedure 11 or 28 U.S.C. §1927 and state statutes, regulations, rules or law so providing, and injuries that are a consequence of any of the foregoing;
>
> . . .

    C.  punitive or exemplary amounts.

*See id.*

  73.  The Sanctions Motions do not seek amounts that constitute covered **Damages** as defined by the Policy because the amounts sought are sanctions, punitive amounts, or awards under Federal Rules of Civil Procedure 11 or 28 U.S.C. §1927.

  74.  Therefore, Continental is entitled to a judgment declaring that the Policy provides no coverage to the **Insureds** for the Sanctions Motion and that Continental has no duty to defend or indemnify the **Insureds** with respect to the Sanctions Motions.

## COUNT III

### For a Declaration that Continental Has No Liability Under the Policy Based on the Firm's Material Misrepresentation in the Application

  75.  Continental re-alleges and incorporates by reference Paragraphs 1-64 of this Complaint as if fully set forth herein.

  76.  The Policy provides that the **Insureds** agree that "the misrepresentation of any material matter by the **Insured** or the **Insured's** agent will render this Policy null and void and relieve the **Company** from all liability herein."  *See* Exhibit A, Section V.L.

  77.  On October 13, 2015, the Firm made a misrepresentation in response to Question 10 of the Application, when it answered "no" to the question:  "After inquiry, is any attorney of the firm aware of … any acts, error or omissions in the performance of professional services that may reasonably be the basis of a professional liability claim against the firm or any member of the firm since the date of the firm's last application to the Company [on August 25, 2014] and that had <u>not</u> been reported to the Company?" (emphasis in original).  The Policy states that the **Insured** agrees that "all of the information and statements provided to [Continental] … are true, accurate and complete and shall be deemed to constitute material representation made by all of

the **Insureds**." *See id.* The Firm did not update or correct its misrepresentation on the Application at any time before the October 30, 2015 inception date of the Policy.

78. In particular, as set forth in Paragraphs 38 through 47 of this Complaint, prior to the Policy's inception, the Firm was aware of acts, errors or omissions in the performance of professional services that may reasonably be the basis of a professional liability claim against the Firm or any member of the Firm and failed to advise Continental. This was material information because it impacted Continental's decision to issue the Policy, which was "issued in reliance upon the **Insured's** representations." *Id.*

79. Therefore, Continental is entitled to a judgment declaring it has no liability under the Policy for the Sanctions Motions because the **Insureds** misrepresented a material matter, relieving Continental from any liability under the Policy.

WHEREFORE, Continental respectfully requests that this Court:

A. Enter judgment that the Policy does not provide coverage for the Sanctions Motions because the Intentional Acts Exclusion bars coverage for claims arising out of the insureds' intentional wrongdoing, and that Continental therefore owes no duty to defend or indemnify any of the insureds against the Sanctions Motions;

B. Enter judgment that the Policy does not provide coverage for the Sanctions Motions because the relief sought does not constitute covered Damages under the Policy, and that Continental therefore owes no duty to defend or indemnify any of the insureds in the Sanctions Motions;

C. Enter judgment that Continental has no liability for the Sanctions Motions because the insureds misrepresented a material matter in the procurement of the Policy, relieving Continental from all liability under the Policy;

D. Award reimbursement of any amounts paid by Continental in the defense of the Sanctions Motions to the extent allowed by law;

E. Award Continental its costs incurred herein and; and

F. Award Continental all other relief to which it may be entitled.

                                        Respectfully submitted,

Dated: May 9, 2017

                              By: <u>/s/ Peter S. French</u>
                                Peter S. French, Attorney No. 16716-49
                                One American Square, Suite 2300
                                Indianapolis, IN 46282
                                Telephone: (317) 632-3232
                                Facsimile: (317) 632-2962
                                pfrench@beneschlaw.com

*Of Counsel*:
Richard A. Simpson
Marc E. Rindner
Leland H. Jones IV
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
Telephone: (202) 719-7000
Facsimile: (202) 719-7049

                                *Attorneys for Plaintiff Continental Casualty Company*